JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Defendant-appellant, Tony Taylor, appeals from a judgment finding him guilty of one count of aggravated robbery with one-and three-year firearm specifications, felonious assault on a peace officer, and failure to comply with an order or signal of a police officer, and sentencing him. For the following reasons, we affirm.
 {¶ 2} In March 2007, Taylor was indicted on five counts: counts one and two, aggravated robbery, in violation of R.C. 2911.01, with one-and three-year firearm specifications; count three, felonious assault, in violation of R.C. 2903.11, with a furthermore clause of assaulting a peace office while in the performance of his official duties; count four, failure to comply with an order or signal of a police officer, in violation of R.C. 2921.331, with a furthermore clause of operating a motor vehicle causing substantial risk of physical harm to persons or property; and count five, receiving stolen property, in violation of R.C. 2913.51. Taylor entered a plea of not guilty to all charges.
 {¶ 3} A jury trial was held in May 2007. The following evidence was adduced.
 {¶ 4} Winston Scott, the aggravated robbery victim, testified that on December 20, 2006, he was walking home from a convenience store near his home at approximately 8:00 or 9:00 p.m. He saw a red car drive past him slowly and turn onto the street where he lived. Scott said that when he got to his street, he saw the red car parked on it. As he walked by the car, two males got out of it. Scott described the first of the two males as being about 5'4" tall, wearing a black jump suit, and a ski mask. The other man was taller, approximately 6'1", and wore a blue shirt, blue jeans, and white shoes, but no ski mask. Scott said he recognized the *Page 4 
taller man as someone he had seen in his neighborhood. He then identified Taylor in court as the taller man, without the ski mask.
 {¶ 5} Scott testified that both men had guns. He said that Taylor got behind him, held a gun to his head, and told him not to move or he would shoot. The man with the ski mask pointed a gun at Scott's side. Scott described Taylor's gun as being silver, with a black handle. He also said it looked like a gun the police use in Jamaica.
 {¶ 6} The men told him to take his hands out of his pockets, which he did, and then they "went into [his] pockets" and took a little over $200, his cell phone, and some "stuff." The men told Scott to "go the other way walk home." Scott left and called the police.
 {¶ 7} A few days later, Scott said that he met with Detective Joseph Greene, who showed him a photo array of six men. Scott chose Taylor from the array, and testified that he was sure it was him because he "turned around and look[ed] at his face and [Taylor] told [him] turn back around don't look at him."
 {¶ 8} On cross-examination, Scott testified that he did not know Taylor prior to the robbery; he had only seen him around his neighborhood. He said he told the police that Taylor had a dark complexion. He agreed that he heard both men "cock the guns." He did not know if the guns were toy guns. He also did not know the make and model of the red car, but agreed that he later identified it to the police.
 {¶ 9} Scott further stated that Taylor looked like he was in his twenties, and agreed that some of the men in the photo array looked older. He also testified that *Page 5 
some of the men in the photo array did not have the same dark complexion as Taylor.
 {¶ 10} The jury posed questions to Scott. They asked if he had any reason to believe he had been followed from the store. Scott replied yes, because he took his money out of his pocket in the store. But he did not see the men in the store.
 {¶ 11} Officer Jeremy Young of the Cleveland Heights Police Department testified that he was on routine patrol on December 23, 2006. Around 4:20 a.m., he turned onto the 800 block of Helmsdale Road in Cleveland Heights and saw two Buicks, a maroon colored one and a blue one, blocking the road. A group of seven or eight people were gathered around the vehicles. Officer Young testified that as he approached, the blue Buick drove away at a normal speed. As he pulled up, almost beside the maroon Buick, he saw two people get into it, and drive off at a normal speed.
 {¶ 12} Officer Young said that he followed the maroon Buick and ran the license plate. The car had been stolen. Officer Young called for back-up. He followed both vehicles at a slow speed. The blue Buick turned onto Taylor Road, and the maroon one followed.
 {¶ 13} Officer Young saw Officer McHugh turn onto Taylor Road between the maroon and blue Buicks, and activate his lights and sirens. The blue Buick then took off at a high rate of speed and the maroon Buick slowed to about 5 m.p.h. Officer Young thought the occupants of the vehicle were going to "bail" because they were going so slowly. Instead of stopping, however, Officer Young saw that the *Page 6 
driver of the maroon Buick suddenly "accelerated rapidly at [Officer McHugh's cruiser]," and "ramm[ed] its vehicle" into Officer McHugh's cruiser. It hit the passenger side of Officer McHugh's front bumper, and "pushed its way through." The maroon car was also damaged, on the front, driver's side of the vehicle. The maroon car then fled.
 {¶ 14} Officer Young testified that in his opinion, with his experience investigating hundreds of accidents, the driver of the maroon Buick appeared to intentionally hit Officer McHugh's vehicle. He said, "[t]here was room in front, there was room behind. He intentionally — you could tell there was a decision point. He came to a near stop. When he saw that car there he had a choice to stop, to go around, behind, and he chose, you could tell, he just muscled right through it with his car." Officer Young did not see the driver of the maroon Buick.
 {¶ 15} Officer Young said he activated his lights and sirens when Officer McHugh was hit, and followed the maroon Buick. The driver fled at a high rate of speed, around 60 m.p.h (in a 25 m.p.h. zone), on Taylor Road, toward East Cleveland. He pursued the vehicle through residential neighborhoods, except for crossing a "major intersection" at Euclid Avenue. Officer Kolb joined him in the pursuit; they both had their emergency lights and sirens on. The maroon car began to have mechanical problems at the border of Cleveland Heights and East Cleveland. The pursuit only lasted about "a minute and a half, two minutes," due to the maroon Buick's mechanical problems. *Page 7 
 {¶ 16} At that point, Officer Young said he thought the driver "was going to bail out of the vehicle." So he pulled up next to the maroon car and "was going to try to pin in the driver door with the front bumper" of his cruiser to "block his escape from the driver's door." When the maroon car stopped, Officer Young stated that he was approximately one foot away from the maroon car. He said both men crawled out of the passenger door and began to run. The men ran "in the same direction easterly," but one ran to the right and one to the left.
 {¶ 17} Officer Young began pursuing the man who went to the left. He did not know if he was the driver or the passenger. He chased him on foot, over a fence, and down a muddy ravine. The suspect ran through several back yards. Officer Young stopped pursuing the man because he was unfamiliar with the area, and it was "very dark" and unsafe.
 {¶ 18} Officer Young stated that Officer Kolb pursued the man who had run to the right.
 {¶ 19} Officer Young explained that there were muddy footprints on the hood and roof of the maroon Buick. He said that when they arrested Taylor, he had "muddy shoes on, he had cuts, [and] scratches." It was a cool evening and Taylor was only wearing a white tee shirt. "There was also mud on his jeans and there were also scratches and abrasions on his hands." He identified a photo of a cut on Taylor's hand that was still bleeding when they took the photo at the station. Taylor's shoes were size 12, Nike's, and had a "unique shoe pattern," which the police later determined to match the muddy prints on the maroon Buick. *Page 8 
 {¶ 20} Officer Young said that Officer McHugh had to be transported by ambulance to the hospital. At the time of trial, Officer McHugh was still on medical leave.
 {¶ 21} On cross-examination, Officer Young stated that the driver of the maroon Buick could have avoided Officer McHugh's cruiser if he had gone "[l]eft, right over the curb or stopped." He was unsure if the maroon car had hit the curb.
 {¶ 22} Officer Young further stated that there were over a dozen footprints from the same shoes on the maroon car, like someone had danced on it. But he admitted that he did not see either of the men "walk, run, or climb" over the hood or roof of the car, nor did he know how long the footprints had been on the car.
 {¶ 23} The jury posed a few more questions to Officer Young. They asked him if he ever saw Taylor drive the maroon car; he did not. They asked him if he saw Taylor on the roof of the car; he did not. They asked him if there were muddy prints inside the car; he did not know. They asked him if Taylor gave an explanation for the cuts and scratches; Taylor told him that he had been playing football. They asked him if he asked Taylor why he was running; he did not.
 {¶ 24} Officer Michael Zubal of the Cleveland Police Department testified that on December 23, 2006, he had been working in the Sixth Police District, which borders Cleveland Heights and East Cleveland. He was called to assist Cleveland Heights officers in a chase of someone who had just struck a Cleveland Heights police cruiser. He was given a description of a black male wearing a red hooded sweatshirt and dark pants. *Page 9 
 {¶ 25} Officer Zubal began driving around the area. He saw a man sitting on a porch of a house. He said it was cold and the man "didn't have a coat on or anything, so we thought this might be the guy." They asked the man if he lived there, and he said he did. They noticed that he had "mud on his pants [and], he was a little sweaty." They told him to go into the house; the man stood up, went to the front door, but did not go in or knock. At this time, he said they thought "this was probably the guy because he wasn't going in the house." They then asked him, "you don't live here, do you. And he said no." Officer Zubal explained that at that point, he put his hand on the suspect's chest to make sure he did not take off running, and he noticed that the man's "heart was racing." Officer Zubal said he fit the description of the male they were searching for, so they detained him until Cleveland Heights officers came to get him.
 {¶ 26} On cross-examination, Officer Zubal agreed that the man did not have a red hooded sweatshirt on, as described. Officer Zubal reviewed his written report, and agreed that in it, he had stated that the man had knocked on the door. He also agreed that in his report, he had stated that the man told him he did not live there, but that he was trying to see a friend.
 {¶ 27} The jury posed questions to Officer Zubal. They asked him if the red-hooded sweatshirt was ever recovered; he said not to his knowledge. They asked him if the porch lights were on when they saw Taylor sitting on it; he said no. They asked him if the white tee shirt was muddy; he said "not that I recall." *Page 10 
 {¶ 28} On recross-examination, Officer Zubal stated that it was the "[t]ime of the morning" that also made him suspicious of Taylor sitting on the porch. He also explained that he thought Taylor could have "ditched the red thing."
 {¶ 29} Officer Paul Kolb of the Cleveland Heights Police Department testified that on December 23, 2006, he was on routine patrol. He heard over the radio that an officer was in pursuit of a stolen vehicle. Officer Kolb said he observed Officer Young pursuing the maroon Buick with his lights and sirens on. As soon as Officer Kolb saw him, he said he also activated his lights and sirens, and assisted in the chase. He remained close behind Officer Young, who was directly behind the suspect vehicle. He estimated the suspect vehicle was traveling around 55 m.p.h. He then saw it slow down and stop. When it stopped, Officer Kolb stated he was about 25 feet from the vehicle.
 {¶ 30} Officer Kolb observed two men in the vehicle. He saw one of the men exit from the passenger door very quickly. He was wearing dark clothing and ran "northeast bound." He then observed a male who "exited the driver's seat towards — dove across over into the passenger side." He said, "[w]hen he got out a tan cup holder/cassette holder *** fell from the driver's lap area." He said the driver was wearing a red jacket with dark jeans. Officer Kolb said that Officer Young pursued the passenger on foot and he chased the driver on foot. As he ran after the driver, he saw a white colored pattern on the back of his clothing.
 {¶ 31} Officer Kolb testified that the driver jumped over a chain link fence and then jumped over a secondary chain link fence, which was much higher. After he *Page 11 
cleared the second fence, which had "cross barbs at the top," the driver slid down a "muddy cliff" that was a 500-foot drop. Officer Kolb said he saw the white pattern again on the back of the driver's clothing as he was running away. He said, "I just remember it. It stuck in my head exactly." Officer Kolb was concerned about his own safety, so he stopped chasing the driver at that point, and went to assist Officer Young.
 {¶ 32} Officer Kolb explained that when they did not catch either of the suspects, they radioed for assistance from Cleveland police. Officer Zubal arrived. Officer Kolb told him which way the suspects had run, gave him a description of the suspects, and Officer Zubal began searching for them. Officer Kolb stated that Officer Zubal later called him and Officer Young to tell them he had a suspect in custody who fit the description of one of the men, but without the jacket. Officer Kolb stated that it was common in police pursuits for suspects to "shed clothing."
 {¶ 33} When they obtained the suspect from Officer Zubal, Officer Kolb noticed immediately that he had mud on his jeans, and a "light colored white pattern on the back of his jeans." Officer Kolb explained that this "was consistent, [an] immediate match in my mind to *** what I saw running away from me from the driver." He then identified Taylor in court.
 {¶ 34} Detective Greene of the Cleveland Heights Police Department testified that he was assigned to investigate a stolen vehicle, which was fleeing from police, and a possible felonious assault on a police officer. He interviewed Taylor, who denied any involvement. *Page 12 
 {¶ 35} Detective Greene explained that they had a series of robberies (one on December 18, 2006, and two on December 20, 2006) involving a maroon vehicle. Thus, there were two other robbery victims, besides Scott. Scott and the other robbery victims identified the maroon Buick as the one involved in the robberies. Detective Greene stated that they tested the vehicle for fingerprints, but the results were negative.
 {¶ 36} On cross-examination, Detective Greene admitted that the other two robbery victims (besides Scott) did not identify Taylor in a photo array. He explained that he obtained the photos from the Bureau of Motor Vehicles. He chose photos of men who were approximately Taylor's age between 16 and 27 years of age, with facial hair, and of similar height and weight.
 {¶ 37} Detective Greene admitted that of the five individuals included in the photo array, one of the men was "graying" in his beard. He included it because the man had facial hair, and so did Taylor. But he agreed that it was "fair to say" that the victim would not mistake this man for the person who robbed him. Detective Greene also admitted that one of the five individuals in the photo array was heavy set, and did not "look anything like Tony Taylor." He explained that he included it because of the man's facial hair. Detective Greene then admitted that another one of the men in the photo array was smiling and had a "gap in his front teeth," while Taylor was not smiling.
 {¶ 38} When asked why Taylor's photo was taped on one side of the folder, while the other five photos were taped on the inside cover, Detective Greene *Page 13 
explained that it was "probably due to [his] clumsy hand," because "arts and crafts [were] very tedious" for him.
 {¶ 39} The state rested and Taylor moved for a Crim.R. 29 acquittal on the charges. The trial court granted Taylor's motion in part, on count five, receiving stolen property, but denied it as to all of the other charges.
 {¶ 40} Taylor's sister, Shana Kent, testified on his behalf. She stated that Taylor did not know how to drive. She said that he had never had a driver's license and she had never seen him drive. She explained that he took the bus, walked, or got rides from friends.
 {¶ 41} The jury found Taylor guilty of count one, aggravated robbery, with both firearm specifications; not guilty of count two, aggravated robbery; guilty of count three, felonious assault (on a peace officer); and guilty of count four, failure to comply with an order or signal of a police officer (causing substantial risk of harm).
 {¶ 42} The trial court sentenced Taylor to a mandatory three years in prison on the firearm specifications, to be served prior to and consecutive to three years on the underlying aggravated robbery conviction; three years on the felonious assault conviction on a peace officer, to be served concurrent to the other convictions; and one year on the failure to comply with an order or signal of a police officer, to be served consecutive to the other convictions, for an aggregate term of seven years in prison.
 {¶ 43} It is from this judgment that Taylor appeals, raising three assignments of error for our review: *Page 14 
 {¶ 44} "[1.] There was insufficient evidence to convict defendant of the firearm specifications, assault, and/or failure to comply.
 {¶ 45} "[2.] The conviction of appellant is against the manifest weight of the evidence.
 {¶ 46} "[3.] Trial counsel was ineffective in failing to file a motion to suppress the photo array identification."
 {¶ 47} Within his first assignment of error, Taylor raises three issues regarding sufficiency of the evidence. First, he maintains that the evidence was not sufficient to convict him of the firearm specifications. Next, he argues that the evidence was not sufficient to convict him of felonious assault on a peace officer. Finally, he contends that the evidence was not sufficient to convict him of failure to comply with an order or signal from a police officer.
 {¶ 48} An appellate court's function in reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." State v. Thompkins (1997), 78 Ohio St.3d 380, 386. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.Jenks at 273. *Page 15 
 {¶ 49} With respect to sufficiency of the evidence on the firearm specifications, Taylor argues that there was no evidence to establish that he was in possession of a firearm during the aggravated robbery, and that if he was in possession of one, there was no evidence that the firearm was operable. We find Taylor's arguments unpersuasive.
 {¶ 50} Taylor was found guilty of R.C. 2911.01(A)(1), with one-and three-year firearm specifications. The pertinent provision of aggravated robbery is defined as:
 {¶ 51} "(A) No person, in attempting or committing a theft offense ***, or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 52} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it."
 {¶ 53} R.C. 2923.11(B)(1) defines "firearm" as "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. `Firearm' includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable."
 {¶ 54} R.C. 2923.11(B)(2) further explains that a trier of fact may rely upon circumstantial evidence, "[w]hen determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant." The circumstantial evidence may include, but is not limited to, "the representations and actions of the individual exercising control over the firearm." Id. *Page 16 
 {¶ 55} And also pertinent to this discussion, under R.C.2923.11(B)(1), "deadly weapon" is defined as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."
 {¶ 56} After viewing the evidence in a light most favorable to the prosecution, we find that sufficient evidence was presented to establish beyond a reasonable doubt that Taylor possessed a firearm and that it was operable.
 {¶ 57} Scott testified that Taylor put a gun to his head and ordered him to take his hands out of his pockets. He described the gun as being silver, with a black handle, and said that it looked like one the police used in Jamaica. Scott also stated that he heard both men cock their guns when they were pointing them at him, and further testified that he believed the men might shoot him. Taylor also represented to Scott that the firearm was operable when he threatened to shoot him if he continued to move. Sufficient evidence was produced such that a rational trier of fact could have found that Taylor possessed a firearm, and that it was operable. Accordingly, Taylor's first issue regarding sufficiency of the evidence of the firearm specifications is without merit.
 {¶ 58} Taylor also argues that the evidence was insufficient to convict him of felonious assault against a peace officer.
 {¶ 59} Taylor was convicted of R.C. 2903.11(A)(2), which provides that "[n]o person shall knowingly *** [c]ause or attempt to cause physical harm to another *** by means of a deadly weapon or dangerous ordnance." If the victim is a peace *Page 17 
officer, the degree of the crime is enhanced from a second degree felony to a first degree felony. R.C. 2903.11(D)(1).
 {¶ 60} Specifically, Taylor maintains that there was no "credible evidence" that he was driving the vehicle, which is the "deadly weapon," that stuck Officer McHugh's cruiser. Alternatively, he contends that even if there was sufficient evidence that he was driving, the state did not present any evidence to establish the element of "knowingly." We disagree with both arguments.
 {¶ 61} Although Officer Young and Officer Kolb stated they never saw who was driving the maroon Buick, Officer Kolb did see the first suspect exit the car very quickly through the passenger door. He then saw the second suspect "d[i]ve across over into the passenger side" and exit the maroon Buick through the passenger door of the car. When the second suspect got out of the car, Officer Kolb saw a tan center console or cassette holder fall from the suspect's lap.
 {¶ 62} Officer Kolb further testified that when the second suspect got out of the vehicle and began running, he had a white design or pattern on the back of his clothing. Later, when Officer Kolb saw the suspect climb over the fence, he saw the white pattern on the back of the suspect's clothing again, and testified that he remembered it "exactly."
 {¶ 63} When Officer Kolb went to the house where Officer Zubal had detained a suspect, Officer Kolb identified Taylor as the man he saw climbing over the passenger seat, exiting the maroon Buick, and fleeing. Although the suspect was *Page 18 
not wearing a red jacket as described, Officer Kolb identified the white pattern on the back of Taylor's jeans as being the same design he observed as the suspect fled.
 {¶ 64} Therefore, we find, after viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence to establish that Taylor was driving the maroon Buick.
 {¶ 65} Taylor also argues that even if the evidence is sufficient to show that he was driving the maroon Buick, there was "absolutely no evidence establishing he acted knowingly in driving the vehicle into Officer McHugh's vehicle." Taylor contends that "an honest review of the evidence" only establishes that "the driver of the maroon Buick knowingly tried to get around the officer by going up on the curb and accidentally scraped the officer's front bumper trying to get around him." We find no merit in this argument.
 {¶ 66} R.C. 2901.22(B) states that a "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 67} Officer Young testified that he saw the maroon Buick behind Officer McHugh's police cruiser. It was traveling so slowly, he thought the occupants were going to "bail". Officer Young stated that instead of stopping, the driver of the maroon Buick suddenly "accelerated rapidly" toward Officer McHugh's cruiser, rammed it, hitting the front bumper, and "pushed its way through." Officer Young *Page 19 
testified that he believed it to be an intentional act "because the driver had plenty of room to either stop or go around."
 {¶ 68} This court finds that sufficient evidence was produced to establish beyond a reasonable doubt that Taylor acted "knowingly." Even if Taylor was simply trying to get around Officer McHugh's vehicle to get away, it does not mean he was unaware that his conduct would likely cause harm. As R.C. 2901.22(B) states, it does not matter what his purpose was. He was aware that his conduct, i.e., accelerating rapidly, and attempting to "muscle" past another vehicle, would probably cause a collision to occur, where it was also likely that the officer driving the cruiser would suffer physical harm as a result of the collision.
 {¶ 69} Taylor's second sufficiency argument lacks merit.
 {¶ 70} In his final sufficiency argument, Taylor maintains that the evidence was not sufficient to convict him of failing to comply with an order or signal of a police officer.
 {¶ 71} Taylor was convicted of R.C. 2921.311(B), which provides that "[n]o person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop."
 {¶ 72} Taylor argues again that there was no evidence to establish that he was driving the vehicle. He also contends that even assuming he was driving, there was still "no evidence establishing that there was visible or audible signals to stop and/or that Defendant observed or heard them." We disagree. *Page 20 
 {¶ 73} This court already determined that there was sufficient evidence to establish that Taylor was driving the maroon Buick. In addition, Officer Young testified that when he saw the maroon Buick stuck Officer McHugh's police cruiser, he activated his lights and sirens. Officer Kolb corroborated Officer Young's testimony and stated that as soon as he saw Officer Young pursuing the maroon Buick with his lights and sirens on, he also activated his. Thus, two officers testified that they pursued the maroon Buick with their lights and sirens activated, for one-and-one-half to two minutes. Rational triers of fact could conclude that the driver heard the sirens and saw the lights.
 {¶ 74} The jury also found Taylor guilty of the furthermore clause, enhancing this crime from a misdemeanor of the first degree to a felony of the third degree. Taylor maintains that the evidence was not sufficient to prove this clause, namely that the operation of the motor vehicle "caused a substantial risk of serious physical harm to persons or property."
 {¶ 75} R.C. 2921.311(C)(5)(a)(i) provides that a violation of failure to comply with an order or signal of a police officer "is a felony of the third degree if the jury or judge as trier of fact finds *** [t]he operation of the motor vehicle by the offender caused a substantial risk of serious physical harm to persons or property."
 {¶ 76} There was evidence presented, when viewed in a light most favorable to the prosecution, to establish that the driver of the maroon Buick was traveling at a high rate of speed; at least 55 or 60 m.p.h. in a 25 m.p.h. zone, through residential neighborhoods and a major intersection. Despite it being "around 4:20 a.m." and *Page 21 
the chase only lasting approximately "a minute and a half, two minutes," this evidence was sufficient to establish a risk of substantial harm to persons or property. Thus, Taylor's third sufficiency argument is without merit.
 {¶ 77} Accordingly, Taylor's first assignment of error is overruled.
 {¶ 78} In his second assignment of error, Taylor contends that his convictions were against the manifest weight of the evidence.
 {¶ 79} In evaluating a challenge to the verdict based on manifest weight of the evidence, the Ohio Supreme Court declared:
 {¶ 80} "[a]lthough a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. [Robinson, supra, at 487]. Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducingbelief.' (Emphasis added.) Black's, supra, at 1594.
 {¶ 81} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. [Tibbs, supra, at 42]. See, also, State v. Martin (1983), *Page 22 20 Ohio App.3d 172, 175 *** (`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.')." Thompkins, supra, at 387.
 {¶ 82} After setting forth the standard on a manifest weight analysis, Taylor states only that "[u]nder this standard, Appellant reasserts the arguments set forth above and requests a new trial." He offers no argument besides his sufficiency argument, nor does he cite any place in the record which shows that the evidence weighed heavily against his conviction.
 {¶ 83} After thoroughly reviewing the record, we conclude that Taylor's convictions did not create such a manifest miscarriage of justice that they should be reversed and a new trial ordered.
 {¶ 84} Three police officers from two different jurisdictions testified at trial about the events of December 23, 2006. Their testimony was consistent, as well as corroborative. Officer Young testified to the initial pursuit of the maroon Buick, and seeing the driver "ram" the car into Officer McHugh's vehicle. Officer Kolb pursued the maroon Buick at a high rate of speed, through residential neighborhoods and across a major intersection, until the maroon Buick stopped. *Page 23 
 {¶ 85} Officer Kolb saw the driver climb from the driver's seat into the passenger seat, exit the car, and take off running. Officer Kolb clearly saw a white pattern on the back of the driver's clothes. Taylor was found and detained by a Cleveland police officer shortly after the chase. Taylor was wearing jeans that had a white pattern on the back of them, which Officer Kolb identified as the design he had seen on the driver's clothing. Taylor's muddy shoes also "uniquely" matched the muddy footprints that were found on the hood and roof of the maroon Buick.
 {¶ 86} Scott, the robbery victim, also identified Taylor in a photo array as the man who had held a gun to him, cocked it, and robbed him. Scott had previously seen Taylor around his neighborhood, so he recognized him. Scott also identified the maroon Buick as the one Taylor and the other man were driving when they robbed him.
 {¶ 87} Thus, it is our view that the jury did not clearly lose its way and create a manifest miscarriage of justice when convicting Taylor of aggravated robbery, felonious assault of a peace officer, and failure to comply with an order or signal of a police officer.
 {¶ 88} Taylor's second assignment of error lacks merit.
 {¶ 89} In his third assignment of error, Taylor maintains that his trial counsel was ineffective in failing to move to suppress Scott's pretrial identification of Taylor in the photo array.
 {¶ 90} In Strickland v. Washington (1984), 466 U.S. 668, the Supreme Court of the United States set forth the two-pronged test for ineffective assistance of counsel. *Page 24 
It requires that the defendant show (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. The first prong "requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. The second prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable." Id.
 {¶ 91} In evaluating whether a petitioner has been denied the effective assistance of counsel, the Ohio Supreme Court held that the test is "whether the accused, under all the circumstances, *** had a fair trial and substantial justice was done." State v. Hester(1976), 45 Ohio St.2d 71, paragraph four of the syllabus. To show that a defendant has been prejudiced, the defendant must prove "that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v.Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus.
 {¶ 92} It is presumed that a properly licensed attorney in the state of Ohio has rendered effective assistance of counsel to a criminal defendant. State v. Hurd, 11th Dist. No. 2001-T-0086, 2002-Ohio-7163, at ¶ 32. With respect to a motion to suppress, the defendant must establish that the motion was meritorious and that he suffered actual prejudice.State v. Gower, 2d Dist. No. 1616, 2003-Ohio-5403, at ¶ 12.
 {¶ 93} The United States Supreme Court approved the use of photo arrays in initial identifications as "used widely and effectively in criminal law enforcement, from *Page 25 
the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs." Simmons v. United States (1968),390 U.S. 377, 384. The Court held that "each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Id.
 {¶ 94} In Neil v. Biggers (1972), 409 U.S. 188, 199-200, the United States Supreme Court stated that when reviewing suggestive identification procedures, the crucial inquiry is "whether under the `totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. *** The factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." See, also, State v. Williams (1995),73 Ohio St.3d 153, 163.
 {¶ 95} In this case, Detective Greene admitted that three of the five men could not have been mistaken for Taylor. Thus, it is likely that the photo array was suggestive and would have been suppressed. But even if the photo array was suggestive as to three of the photographs, it was not so suggestive that it created a *Page 26 
substantial likelihood of misidentification. Scott testified that he recognized Taylor from seeing him around his neighborhood. He stated that he turned around to look at his assailant, and he saw his face. He chose Taylor from the photo array close in time to when the robbery occurred; i.e., eight days after he was robbed. He said he was "sure" it was him. Therefore, the photographic identification was not prejudicial, and Taylor's counsel was not ineffective by not moving to suppress it.
 {¶ 96} Accordingly, Taylor's third assignment of error is not well taken.
 {¶ 97} The judgment of the Cuyahoga County Court of Common Pleas is affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANTHONY O. CALABRESE, JR., J., CONCURS; COLLEEN CONWAY COONEY, P.J., CONCURS IN JUDGMENT ONLY *Page 1